IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CREGG A. SNYDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:12-CV-00782-SNLJ-SPM |
| | ) | |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, denying the

applications of Plaintiff Cregg Snyder for Disability Insurance Benefits ("DIB") under Title II of

the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). This matter

was referred to the undersigned United States Magistrate Judge for review and a recommended

disposition pursuant to 28 U.S.C. § 636(b). The undersigned recommends that the decision of

the Commissioner be reversed and the case remanded for further proceedings.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant in this case.

# I.    PROCEDURAL HISTORY

On November 10, 2008, Plaintiff applied for DIB and SSI, alleging that he had been disabled since September 29, 2008, due to post-traumatic stress disorder (PTSD), depression, heart attack, angina, progressive degenerative joint disease in his back and shoulder, asthma, bronchitis, and ulcers. (Tr. 101-06, 134). On February 17, 2009, those applications were denied. (Tr. 44-48). On April 2, 2009, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ). (Tr. 49-53). After a hearing on December 7, 2010, the ALJ issued an unfavorable decision. (Tr. 9-23). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council, but the Appeals Council declined to review the case on March 21, 2011. (Tr. 1-4). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

# II.    FACTUAL BACKGROUND

## A.  BACKGROUND

As of the date of the hearing before the ALJ, Plaintiff was 43 years old and had a twelfth grade education. (Tr. 26-27). He testified that he has not worked since September 29, 2008, when he had a heart attack behind the wheel of a semi. He stated that his disability onset date was December 31, 2008. (Tr. 27). Plaintiff testified that he is prevented from working on a full-time basis by post-traumatic stress disorder, severe depression, and social anxiety disorder. (Tr. 27-28.) He does not do well with others, gets panic attacks, and has been known to black out. (Tr. 28). Plaintiff testified that he would have a problem if he had to work around other people. (Tr. 36). He has struck people in the workplace on more than one occasion and has been

terminated. (Tr. 37). Plaintiff takes BuSpar[2] and amitriptyline,[3] which help the panicky feeling to go away and calm him down some. (Tr. 37). Plaintiff is seeing a psychologist every other week; the psychologist is encouraging him to be more social and is trying to help him with his post-traumatic stress disorder. (Tr. 32-33).

Plaintiff has arthritis in his legs and back, has numerous leg and knee injuries, and has broken his back on two occasions; due to these issues, he cannot stand for long periods of time. (Tr. 28). He has had no back surgeries. He was most recently treated for his back last month by Dr. David Myers, D.O., and has been seeing him monthly for over two years. (Tr. 29).

Plaintiff has been diagnosed with both asthma and emphysema. He gets short of breath sometimes, including when walking across a parking lot to his car. (Tr. 39).

Plaintiff testified that the State of Missouri has found him to be totally and permanently disabled. (Tr. 30).

On a typical day, Plaintiff watches TV, checks email, or plays solitaire all day. He sometimes does laundry or dishes. (Tr. 30).

### B. RECORDS OF TREATING SOURCES

On August 3, 2008, Plaintiff presented at the Phelps County Regional Medical Center (PCMRC) Emergency Department complaining of an injury to his right knee from a fall; he reported that it was painful and could bear no weight. (Tr. 269). An X-ray was unremarkable.

---

[2] BuSpar is a brand name for buspirone and is used to treat anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html.

[3] Amitriptyline is used to treat symptoms of depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html.

(Tr. 282).  He was given Vicoprofen[4] and a knee immobilizer and advised to rest, elevate, and ice his knee and follow up with an orthopedist.  (Tr. 271).

On September 29, 2008, Plaintiff presented at the PCRMC Emergency Department stating that he had been driving when he had a sudden onset of diaphoresis, nausea, and chest discomfort.  (Tr. 232, 256).  He pulled over and, while walking, developed chest pain and shortness of breath and had a syncopal episode.  (Tr. 232).  A cardiologist noted that an EKG was normal.  He diagnosed unstable angina; syncope, etiology unknown; tobacco use disorder; and obesity.  (Tr. 233).  He recommended admission to rule out myocardial infarction.  Plaintiff was given Phenergan[5] and nitroglycerin[6] and was admitted to the hospital.  (Tr. 257, 268).  A cardiac catheterization was performed the next day; it showed normal appearing coronary artiography, normal LV systolic function, EF 67%, and no systolic gradient noted across the aortic valve.  (Tr. 254).  Also on September 30, 2008, a transthoracic echocardiography report showed mostly normal and a few mild results; it was noted that some results were consistent with mild pulmonary hypertension.  (Tr. 243-44).  Plaintiff was discharged on October 1, 2008, with diagnoses of non-cardiac chest pain and history of pulmonary disease.  He was prescribed Lovenox[7] and also advised to take daily aspirin and Nexium.[8]  (Tr. 235).  A chest CT was

---

[4] Vicoprofen is a brand name for a medication containing hydrocodone and ibuprofen; it is used to relieve moderate to severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html.

[5] Phenergan is a brand name for promethazine and is used to treat allergic reactions, anaphylaxis, cold symptoms, and motion sickness.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682284.html

[6] Nitroglycerin is used to treat episodes of angina (chest pain) in people who have coronary artery disease.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601086.html.

[7] Lovenox is a brand name for enoxaparin and is used to prevent blood clots.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601210.html.

scheduled for the next day. Dr. Kevin Brewer, D.O., noted that after the CT scan, Plaintiff could resume usual activities. (Tr. 236).

On October 7, 2008, Plaintiff presented at the Emergency Department for follow up. (Tr. 208). He reported having chest tightness for two to three weeks off and on, as well as chronic low back pain and right knee pain. (Tr. 341). A chest X-ray was negative. (Tr. 185). Knee X-rays showed minimal/mild bony hypertrophic at the knee. (Tr. 186). Plaintiff was advised to follow up with a primary care provider as soon as possible and to continue taking ibuprofen as needed for knee pain. He was advised to get out of his truck and walk periodically to prevent deep vein thrombosis. He was prescribed nitroglycerine and "asa."[9] (Tr. 208).

On November 12, 2008, Plaintiff went to the Veterans Administration to establish care. (Tr. 199). He reported chronic bronchitis, black out spells, chest pain, depression, and back and knee pain. It was noted that rhythm strips from his prior hospitalization showed no arrhythmias, and that it was likely that Plaintiff had "noncardiac chest pain likely GI etiology." (Tr. 201). His right shoulder and right knee had a limited range of motion. (Tr. 200). Screens for PTSD and depression were positive. (Tr. 201-02). His active medications were noted to be an albuterol inhaler to be used for shortness of breath; daily aspirin; and nitroglycerin to be taken as needed for chest pain. (Tr. 328).

On December 5, 2008, Plaintiff had a head CT that showed no acute intercranial process and sinus opacification. (Tr. 347-48). He had a radiological examination of his lumbar spine that showed no definite or significant decrease in the height of the lumbar vertebral bodies; minimal/slight anterior wedging at L1; tiny marginal osteophyte formation; no definite decrease

[8] Nexium is a brand name for esomeprazole and is used to treat gastroesophageal reflux disease. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699054.html.

[9] This may be a reference to acetylsalicylic acid (aspirin).

in the height of the disc spaces; no spondylolisthesis, and intact pedicles. (Tr. 348). A radiological examination of the shoulder performed due to shoulder pain showed a slightly irregular equal margin at the lateral aspect of the clavicle at the AC joint; a radiographic appearance consistent with small erosive changes; no abnormal soft tissue calcification; and bony changes probably representing small erosions. (Tr. 349). A radiological examination of the right knee showed minimal bony hypertrophic changes; no fracture, dislocation, or bony destruction; no definite joint effusion; and no definite calcified loose body. (Tr. 349-50). An EEG was normal in the waking and drowsy states. (Tr. 324).

Also on December 5, 2008, Plaintiff presented to Dr. Zachary H. Osborn, Ph.D., a psychologist, and reported struggling with PTSD. He reported having "blackout" episodes where he became violent, increased intrusive thoughts, nightly nightmares, flashbacks, avoidance, social distancing, emotional restriction, anhedonia, increased irritability, poor concentration, poor sleep, hypervigilance, exaggerated startle, increased sadness, emotional lability, and variable appetite. He reported general suicidal and homicidal ideation without plans or intentions. (Tr. 325). He was visibly upset during the interview when discussing his trauma stressor. He also reported chronic pain at a level of seven out of ten and indicated that he had discussed pain management with his primary care provider. Plaintiff was diagnosed with major depressive disorder and PTSD and was assigned a Global Assessment of Functioning ("GAF") score of 51.[10] (Tr. 326). He was scheduled to meet with a therapist and medication manager. (Tr. 327).

_____

[10] The Global Assessment of Functioning ("GAF") Scale is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental*

On December 6, 2008, Plaintiff went to the emergency department at PCRMC reporting shortness of breath for two days, as well as chronic bronchitis and a sinus infection. (Tr. 221). A chest X-ray showed possible acute bronchitis or an early right perihilar infectious infiltrate. (Tr. 218).

On December 10, 2008, Plaintiff saw Veneta J. Raboin, a clinical nurse specialist. (Tr. 320-24). He reported depression; feelings of loneliness and worthlessness, and moodiness. (Tr. 321). He reported he did not like being in public areas, was hypervigilant, had problems getting to sleep, and had nightmares. (Tr. 321-22). It was noted that he had a history of being significantly abused and that he had witnessed a fellow soldier and another individual being killed. (Tr. 322). His venlaxafine[11] dosage was increased. (Tr. 323).

On December 31, 2008, Plaintiff was seen by social worker Becky Ragland. (Tr. 311-320). He reported having nightmares about 50% of the time he sleeps, and he reported that he had not slept in two days. He noted that he cannot handle being around crowds and once dove behind a cash register when a balloon popped. (Tr. 311). He reported that his concentration "stinks," he is a slow starter, he has a "pretty bad temper," and he has had some increase in tearfulness. (Tr. 312). His medications were noted to be albuterol,[12] aspirin, omeprazole,[13]

---

*Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

[11] Venlafaxine is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html.

[12] Albuterol is used to treat wheezing, shortness of breath, coughing, and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682145.html.

[13] Omeprazole is used to treat gastroesophageal reflux disease.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html.

trazodone,[14] and venlafaxine. (Tr. 312-13). On mental status examination, Plaintiff appeared anxious, had difficulty staying on topic, and had some rapid speech; his leg tapped throughout most of the session; and he was shaky, distressed, and tearful discussing traumatic episodes from his past. (Tr. 313). Plaintiff reported chronic pain at a level of eight out of ten. Ms. Ragland diagnosed PTSD, alcohol abuse in partial remission, and nicotine dependence, and she assigned a GAF of 51. (Tr. 320).

On June 23, 2009, Plaintiff saw Dr. Richard Feco, Psy.D., reporting insomnia, PTSD, isolating himself, and a history of violent behavior. (Tr. 384-86). He stated that he has trouble falling asleep and staying asleep and recently went for three days without sleeping. Dr. Feco noted that his mood was dysphoric, his insight and judgment were poor, and he had the following symptoms: memory problems, poor concentration, anhedonia, sleep problems, sadness, helplessness, guilt, low energy, flashbacks, nightmares, irritability, anger, low frustration tolerance, and isolation. Dr. Feco diagnosed PTSD; major depressive disorder, recurrent moderate; and primary insomnia. He assessed a GAF of 55. (Tr. 386).

Dr. Feco continued to treat Plaintiff through August 2010. On July 13, 2009, Dr. Feco signed a treatment plan for Plaintiff. (Tr. 379). Notes from October 13, 2009 state that Plaintiff had made some progress on his depression but continued to have depressive symptoms, difficulty with sleep, and low energy; in addition, he had nightmares and was at times irritable and angry. Notes from January 19, 2010, indicate that Plaintiff continued to have periods of depression and problems with anxiety and nightmares, and that he tended to isolate himself in his home. Notes from May 4, 2010, indicate that Plaintiff was experiencing symptoms of depression, had crying spells, often had dreams and flashbacks, had overwhelming anxiety, and became irritable and

---

[14] Trazodone is used to treat depression and anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html.

angry, and worried constantly. (Tr. 380-81). Notes from June 23, 2010, indicate that Plaintiff continued to experience symptoms of PTSD and had crying spells, sleep problems, loneliness, sadness, low energy, poor concentration, nightmares, flashbacks, irritability, anger, guilt, anhedonia, fear, and worry. Dr. Feco assigned a GAF of 55. (Tr. 382-83). Notes from August 25, 2010, indicate that Plaintiff's mood vacillated, that he had ongoing flashbacks and nightmares, that he displayed a startle response at loud noises, and that he became very sad and depressed when he was having recurring nightmares. (Tr. 380-81).

### C.  OPINION EVIDENCE AND CONSULTATIVE EXAMINATIONS

On November 6, 2008, Plaintiff saw Thomas J. Spencer, Psy.D., for a psychological evaluation. (Tr. 180-84). Dr. Spencer noted that Plaintiff reported a history of blackouts and violence, PTSD stemming from an incident from when he was in the Army, anxiety in large crowds, irritability, depression, poor sleep, sluggishness, and poor attention and concentration. (Tr. 181-82). Dr. Spencer noted that Plaintiff's mood as a little anxious and his affect was restricted, though his eye contact was good, his speech was within normal limits, his flow of thought was intact and organized, he had no hallucinations or delusions, and his insight and judgment were fairly intact. (Tr. 182-83). He grimaced as he walked/sat down, ambulated without assistance but with a limp, and had motor behavior generally within normal limits. (Tr. 182). Dr. Spencer diagnosed posttraumatic stress disorder, chronic and major depressive disorder, recurrent, moderate; he assigned a GAF of 50-55. Dr. Spencer's opinion was that Plaintiff's mental illness interfered with his ability to engage in employment suitable for his age, training, experience, and/or education. (Tr. 184).

On February 17, 2009, Dr. Marc Maddox, Ph.D., completed a Psychiatric Review Technique form and a Mental RFC Assessment for Plaintiff. (Tr. 355-57, 364-72). He found

that Plaintiff had medically determinable impairments of major depression and PTSD. (Tr. 367-68). He opined that Plaintiff had moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and mild restriction of activities of daily living. (Tr. 372). He opined that Plaintiff was moderately limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 355-56). He found no significant limitations in any of the other areas assessed. (Tr. 356).

On February 17, 2009, Marilyn Banks, a single decision maker, completed a Physical RFC Assessment. (Tr. 358-63). She opined that Plaintiff could lift ten pounds frequently or occasionally; could stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8-hour workday; could sit about 6 hours in an 8-hour day; and could push and/or pull an unlimited amount. (Tr. 359). She opined that Plaintiff could never balance but could occasionally climb and stoop and could frequently kneel, crouch, or crawl. (Tr. 361). She found no manipulative, visual, or communicative limitations. (Tr. 361-62). She found Plaintiff should avoid concentrated exposure to extreme cold or vibration. (Tr. 262).

On November 24, 2009, Dr. Richard Feco, Psy.D., completed a form indicating that Plaintiff had marked difficulties in maintaining social functioning; deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; and

repeated episodes of deterioration or decompensation in work or work-like setting which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors). (Tr. 378).

**D. VOCATIONAL EVIDENCE**

Vocational Expert (VE) Denise Waddell testified at the hearing before the ALJ. (Tr. 38-41). She testified that Plaintiff's past work was as a truck driver (medium, SVP 4, semi-skilled) and a grill cook (light, SVP 3, semi-skilled). (Tr. 38). The ALJ asked the VE to consider

> a 43-year-old individual who has accomplished a twelfth grade education and who . . . would possess the strength to perform a wide range of sedentary work with only occasional stooping, kneeling, and crouching. And in the nonexertional area, this individual would . . . this person has been diagnosed or at least referenced with an affective disorder and some anxiety related disorders, so I'm going to limit this to concentration necessary for unskilled working, really working in relative isolation with limited contact with peers and coworkers.

(Tr. 39-40). The VE testified that such an individual could not do Plaintiff's past work but could do work in jobs such as wire wrapper (500 jobs in Missouri; 34,000 nationally); printed circuit board inspector (1,800 jobs in Missouri, 56,000 nationally); and semiconductor assembler (2,000 jobs in Missouri; 115,000 nationally). (Tr. 40). The ALJ then posed a second hypothetical:

> This individual would possess the strength to perform a wide range of sedentary work. However, this person would be unable to complete a full work day without interruptions from psychologically based symptoms, and would possess a marked limitation in the area of interacting appropriately with peers, coworkers, supervisors and the general public.

(Tr. 40). The VE testified that no work would be available for such a person. (Tr. 41).

**III.  STANDARD FOR DETERMINING DISABILITY UNDER THE ACT**

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.  <u>DECISION OF THE ALJ</u>

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2012. Plaintiff had not engaged in substantial gainful activity since December 31, 2008, the alleged onset date (as amended at the hearing). The ALJ found that Plaintiff had the following severe impairments: affective disorders, anxiety-related disorders, heart problems, disorders of the joints, and asthma. (Tr. 11). The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment

in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12). The ALJ found that Plaintiff had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except not able to occasionally able to [sic] bend forward at the waist, not able to occasionally bend at knees to come to rest on knees, and is able to occasionally to bend downward by bending legs and spine. The claimant is able to sustain concentration necessary for unskilled work and the claimant is able to interact appropriately with peers and supervisors in a setting that requires limited social interaction." (Tr. 17). The ALJ found that Plaintiff could not perform his past relevant work; however, relying on the testimony of the VE, the ALJ concluded that there were other jobs Plaintiff could perform. (Tr. 21-22). Thus, the ALJ found Plaintiff had not been under a disability, as defined in the Social Security Act, from December 31, 2008, through the date of the decision. (Tr. 23).

## V.     DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence 'is less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations

regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## B. THE ALJ'S CONSIDERATION OF OPINION EVIDENCE IN ASSESSING PLAINTIFF'S RFC

Plaintiff contends that the ALJ made several errors in considering opinion evidence when he assessed Plaintiff's RFC. With respect to Plaintiff's mental impairments, Plaintiff contends that the ALJ erred by failing to adequately address the medical opinions in the record and explain the weight he gave to each, including the opinions of his treating psychologist, Dr. Randal Feco, and the non-examining psychological medical consultant, Dr. Marc Maddox. The undersigned agrees and finds that the ALJ's failure to adequately explain his reasons for discounting the opinion of Plaintiff's treating psychologist requires remand.

Dr. Feco is a psychologist who treated Plaintiff for mental impairments on several occasions in 2009 and 2010, and he completed a form in which he offered opinions about Plaintiff's significant difficulties in social functioning, concentration, ability to complete tasks, and episodes of decompensation in work-like settings. The opinion of a treating physician or psychologist is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The regulations specify that the ALJ "will always give good reasons in [the] notice of determination

or decision for the weight [he or she] give[s] [a] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *see also Tilley*, 580 F.3d at 670.

The ALJ's evaluation of Dr. Feco's opinion was as follows:

> Richard Feco, Psy.D.'s opinions at Exhibit 8F show the claimant is disabled or unable to work and are inconsistent with his earlier reports from Exhibit 3F and 9F where the claimant could return to other duties. A change in opinion such as this would be acceptable if the objective medical evidence showed a change in the claimant's condition that would explain the difference. However, a close inspection of the medical evidence in this matter fails to show any change in the claimant's objective findings on examination or diagnostic testing. It is curious that if the claimant's condition worsened to justify the changes in the doctor's opinion he would not request another evaluation for possible surgical intervention or have new diagnostic test results that confirm the worsening of her back problems. Instead, it appears that the change in his assessment is based solely on the claimant's subjective complaints of pain.

(Tr. 19).

This evaluation is inadequate for several reasons. First, neither Exhibit 3F nor Exhibit 9F contains any report from Dr. Feco that is inconsistent with his opinions in Exhibit 8F. Exhibit 3F does not contain any records or reports from Dr. Feco at all; rather, it contains records of Plaintiff's emergency room visits and hospitalizations for physical problems, including chest pain, knee pain, and upper respiratory illnesses. Exhibit 9F contains Dr. Feco's treatment notes, which indicate that Plaintiff had numerous severe mental symptoms throughout the period of treatment and do not appear inconsistent with his opinion; it does not contain anything suggesting that Dr. Feco has changed his opinion about Plaintiff's abilities. Second, the ALJ seems to be discrediting Dr. Feco's opinion regarding Plaintiff's *mental* impairments based on the fact that Dr. Feco did not order diagnostic tests related to Plaintiff's back problems or evaluate the possibility of surgical intervention, suggesting that the ALJ may have confused the opinion of Dr. Feco with that of someone else. Third, the ALJ apparently discredited Dr. Feco's

opinion because it was based on Plaintiff's subjective complaints of pain, when actually Dr. Feco's opinion was unrelated to pain.

In sum, the ALJ did not give good reasons for his decision to discredit the opinion of Dr. Feco, and his decision to do so was not supported by substantial evidence. Thus, remand is required. *See Anderson v. Barnhart*, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand"); *Clover v. Astrue*, No. 4:07CV574-DJS, 2008 WL 3890497, at *12 (E.D. Mo. Aug. 19, 2008) ("Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand."); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give to your treating source's opinion."). On remand, the ALJ should assess Dr. Feco's opinion under the appropriate regulations and explain the weight he gives to Dr. Feco's opinion and the reasons for that weight.

The undersigned further notes that the ALJ did not explain the weight he gave to the opinion of Marc Maddox, the state agency psychological consultant. On remand, unless the ALJ gives controlling weight to the opinion of Dr. Feco, the ALJ should also explain the weight given to Dr. Maddox's opinion. *See* 20 C.F.R. § 404.1527(e)(2)(ii), 416.927(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . .").

Plaintiff also challenges the ALJ's assessment of his physical impairments. Plaintiff argues that the ALJ erred by determining Plaintiff's RFC without obtaining opinion evidence from an acceptable medical source regarding Plaintiff's physical limitations, that there is no

medical evidence in support of the physical RFC, and that the ALJ erred by improperly relying on the opinion of a single decision maker in determining Plaintiff's RFC.

"The record must include some medical evidence that supports the ALJ's residual functional capacity finding." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quotation marks omitted). However, where there is sufficient medical evidence in the record to support the RFC determination, the absence of an opinion from an acceptable medical source does not necessarily require remand. *See Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007) (affirming the ALJ's decision despite a lack of medical opinion evidence where the medical records contained "facts, observations, and medical conclusions which bear directly on the extent of [the claimant's] ability to function in a work environment.").

Here, it is difficult to determine from the ALJ's decision what, if any, medical evidence he relied on in determining Plaintiff's RFC. The only opinion evidence in the record regarding Plaintiff's physical abilities is the opinion of the non-medical single decision maker. In addition, the ALJ's analysis of Dr. Feco's opinions suggests that the ALJ may have mistakenly believed that there was a doctor's opinion in the record regarding Plaintiff's physical limitations, and it is unclear whether that belief affected his assessment of Plaintiff's RFC or his decision about whether he needed to further develop the record. Although Defendant notes that the medical record contains evidence from both treating and examining physicians, neither the ALJ nor the Defendant explains how that evidence supports the ALJ's physical RFC finding; moreover, it is not apparent to the undersigned how the findings and observations in those medical records translate into the findings made by the ALJ.

On remand, the ALJ should re-assess Plaintiff's RFC and should ensure that his physical RFC assessment is supported by some medical evidence. This may require contacting Plaintiff's physicians or obtaining a consultative examination by a medical expert.

### C. THE DISCREPANCY BETWEEN THE RFC ASSESSMENT AND THE HYPOTHETICAL POSED TO THE VOCATIONAL EXPERT

Plaintiff also argues that the ALJ's decision at Step Five is not supported by substantial evidence because the hypothetical the ALJ posed to the VE is not the same as the RFC finding.

At Step Five, the Commissioner bears the burden of establishing that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). Where, as here, a claimant has significant nonexertional limitations, the ALJ is required to utilize the testimony of a vocational expert at Step Five to meet this burden. *Id.* "'Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.'" *Collins v. Astrue*, 648 F.3d 869, 872 (8th Cir. 2011) (quoting *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007).

Here, it is unclear whether the hypothetical question posed to the VE contained all of the limitations in the RFC, because it is unclear what limitations were in the RFC. In the hypothetical question posed to the VE, the ALJ described an individual who

> would possess the strength to perform a wide range of sedentary work with **only occasional stooping, kneeling, and crouching** . . .

(Tr. 39-40). In contrast, in in his RFC finding, the ALJ found that Plaintiff had the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except **not able to occasionally able to [sic] bend forward at the waist**, **not able to occasionally bend at knees to come to rest on knees**, and **is able to occasionally to [sic] bend downward by bending legs and spine**.

(Tr. 17) (emphasis added).

Defendant argues that the ALJ was apparently trying to provide definitions of the terms for stooping, kneeling, and crouching in the body of his RFC finding. *See Social Security Administration's Programs Operating Manual System (POMS)*, DI 25001.001, Medical-Vocational Quick Reference Guide, https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001 (defining stooping as "bending the body downward and forward by bending the spine at the waist"; defining crouching as "bending the body downward and forward by bending the legs and spine"; and definingkneeling as "bending the legs at the knees to come to rest on the knee or knees"). This appears to be a reasonable assumption.

Defendant then argues that the only reasonable reading of the ALJ's RFC finding is that Plaintiff has the RFC to occasionally stoop, occasionally kneel, and occasionally crouch, such that his RFC finding is consistent with the hypothetical to the VE. The undersigned disagrees. Assuming that the ALJ was attempting to use the POMS definitions, the ALJ stated in the RFC finding that Plaintiff was *not* able to occasionally kneel—the opposite of the interpretation offered by Defendant. Moreover, his sentence regarding stooping is equally amenable to an interpretation that Plaintiff is "not able to" stoop as it is to an interpretation that Plaintiff was "occasionally able to" stoop.

In light of the uncertainty regarding whether the hypothetical question incorporated all of the limitations in Plaintiff's RFC in the question posed to the VE, remand is appropriate. *See Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011) ("[W]hen a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence.") (internal quotation marks omitted); *Swope v. Barnhart*, 436 F.3d 1023, 1026 (8th Cir. 2006) (remanding where the ALJ's hypothetical to the vocational expert did not include all of Plaintiff's impairments). On remand, the ALJ should clarify his findings regarding

Plaintiff's RFC and should ensure that the hypothetical question posed to the VE includes all of the impairments in the RFC.

### VI.    CONCLUSION

For the reasons set forth above, the undersigned finds that the decision of the Commissioner was not supported by substantial evidence.  Accordingly,

**IT IS HEREBY RECOMMENDED** that decision of the Commissioner of Social Security be **REVERSED** and that this case be **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of August, 2013.